UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re AFFILIATED COMPUTER SERVICES ERISA LITIGATION | § § § § § | Master File No. 3:06-CV-1592-M |
| This Document Relates To: ALL ACTIONS | § § § § § § § | |

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs Terri Siméon and Kyle Burke, participants in the ACS Savings Plan (the "Plan"), which was sponsored by Affiliated Computer Services, Inc. ("ACS" or the "Company"), on behalf of themselves and a class of all others similarly situated (the "Participants"), allege as follows:

### NATURE OF THE ACTION

1.      Plaintiffs, who were a participants in the Plan during time periods relevant to this Complaint, bring this civil enforcement action under § 502 (a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of a class of all Participants in the Plan for whose individual accounts the Plan held shares of ACS common stock as part of the ACS Stock Fund investment option in the Plan (the "Class") at any time between December 31, 1998, and the present (the "Class Period"). Defendants are the named and de facto fiduciaries of the Plan, who are deemed "fiduciaries" under the broad definition of fiduciary under § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). Plaintiffs bring this action on

behalf of the Plan and the Class pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3).

2.    As more fully set forth below, Defendants breached their fiduciary duties to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor ("DOL") Regulations, 29 C.F.R. 2550. Defendants breached their fiduciary duties to the Participants in various ways, including, but not limited to: (i) misrepresenting and failing to disclose material facts to the Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Participants solely in the interests of the Participants for the exclusive purpose of providing benefits to Participants and their beneficiaries; (iii) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify the investments in the Plan so as to minimize the risk of large losses; and (v) permitting the Participants to continue to elect to invest their retirement monies in ACS common stock when it was imprudent to do so, and when the Participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, restitution, and other monetary relief. Insofar as any Defendant is sued alternatively as a knowing participant in a breach of fiduciary duty for equitable relief, Plaintiffs intend to proceed pursuant to § 502(a)(3) of ERISA (29 U.S.C. 5 1132(a)(3)).

2

3.      Plaintiffs allege that Defendants breached their fiduciary duties by negligently misrepresenting and negligently failing to disclose material information necessary for Participants to make informed decisions concerning Plan assets and benefits and the appropriateness of the Plan investment in ACS stock, including, but not limited to, the backdating of stock option grants to ACS senior executives Jeffrey A. Rich ("Rich") and Mark A. King ("King"), the related concealment of the Company's true financial and operating condition, the concealment of serious problems relating to the Company's senior management integrity and competence, and serious questions relating to legal and regulatory compliance which has led to, among other things, ongoing investigations by the Department of Justice ("DOJ"), the United States Securities and Exchange Commission ("SEC") into inappropriate practices relating to executive stock options grants by many companies, including ACS.

4.      The executive stock scandal at ACS as also caused or contributed to the market price of ACS common stock underperforming the market during times relevant to the Complaint. Among other things, when the Company's problems relating to the backdating of stock option grants were disclosed in part, the trading price of ACS common stock declined precipitously, including a decline of approximately $5 per share, or 10%, in November 2006.  While a proposed takeover offer for the Company has effectively buoyed the market price of ACS common stock during much of 2007, the value of ACS common stock, including the ACS common stock held by the Participants in their plans accounts, has been depressed and diminished due to the cloud which remains over the Company because of the unresolved, serious questions about the propriety of the Company's executive stock option practices.

## INTRODUCTION

5.      Stock option grants give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually does not vest for a year or more, but then it continues for several years. The exercise price is usually the stock's closing price on the date of grant, and the lower the exercise price at the time of the grant, the more valuable the stock option becomes when it vests. According to its public filings with the SEC and materials distributed to shareholders, ACS was no different:

> As SEC Chairman Christopher Cox testified before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on September 6, 2006, "backdating" is a practice by which a stock option is publicly reported as having been granted on one date, but is actually backdated by a period of weeks or months to a date where the stock price was trading at a lower price. Such backdating allows company executives and stock option grantees to realize immediate unearned and undisclosed financial gains at the expense of the company and its shareholders.

6.      On March 18, 2006, in an article entitled "The Perfect Payday: Some CEOs Reap Millions by Landing Stock Options When They Are Most Valuable; Luck – or Something Else?," The Wall Street Journal published an analysis of stock options granted to select chief executive officers and directors of several companies, including ACS and defendant Rich. According to The Wall Street Journal's analysis, six options that were granted to defendant Rich between 1995 and 2002 were dated just before a rise in the stock price or at the bottom of a steep drop. With regard to the option backdating scheme at ACS, The Wall Street Journal stated, in pertinent part, as follows:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of

his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

Mr. Rich called his repeated favorable option-grant dates at ACS "blind luck." He said there was no backdating, a practice he termed "absolutely wrong." A spokeswoman for ACS, Lesley Pool, disputed the Journal's analysis of the likelihood of Mr. Rich's grants all falling on such favorable dates. But Ms. Pool added that the timing wasn't purely happenstance: "We did grant options when there was a natural dip in the stock price," she said. On March 6, ACS said that the SEC is examining its option grants.

*       *       *

While most of Mr. Rich's stock-option gains were due to rises in ACS stock, the exceptional timing of grants enhanced his take. If his grants from 1995 through 2002 had come at each year's average share price, rather than the favorable dates, he'd have made about 15% less.

An especially well-timed grant, in which Mr. Rich received 500,000 options at $11.53, adjusted for stock splits, was dated Oct. 8, 1998. This happened to be the bottom of a steep plunge in the price. The shares fell 28% in the 20 trading days prior to Oct. 8, and rose 60% in the succeeding 20 trading days.

ACS's Ms. Pool said the grant was for Mr. Rich's promotion to CEO. He wasn't promoted until February 1999. Ms. Pool said there was a "six-month transition plan," and the Oct. 8 option grant was "in anticipation" of his promotion.

Mr. Rich would have fared far worse had his grant come on the day ACS announced his promotion. The stock by then was more than twice as high. The grant wasn't reported to the SEC until 10 months after the stated grant date. Ms. Pool said that was proper under regulations in place at the time.

A special board committee oversaw Mr. Rich's grants. Most years, its sole members were directors Frank Rossi and Joseph O'Neill. Mr. Rossi declined to comment. *Mr. O'Neill said, "We had ups and downs in our*

5

*stock price like any publicly traded stock. If there were perceived low points, would we grant options at that point? Yes."*

Mr. Rich said grants were made on the day the compensation committee authorized them, or within a day or so of that. He said he or Chairman Darwin Deason made recommendations to the special board committee about option dates. Mr. Rich, who is 45 years old, resigned abruptly as ACS's chief executive on a Thursday in September to "pursue other business interests."

Again, his timing was advantageous. In an unusual separation agreement, the company agreed to make a special payment of $18.4 million, which was equal to the difference between the exercise price of 610,000 of his outstanding stock options and the closing ACS stock price on the day of his resignation.

But the company didn't announce the resignation that day. On the news the next Monday that its CEO was departing suddenly, the stock fell 6%. *Mr. Rich netted an extra $2 million by cashing in the options before the announcement, rather than on the day of it.*

Mr. Rich said ACS signed his separation agreement on Friday, using Thursday's price for the options payout. He said it waited till Monday to release the news because it didn't want to seem "evasive" by putting the news out late Friday.

(Emphasis added).

7.     Defendants attempted to downplay the significance of the March 18, 2006 <u>Wall Street Journal</u> article in an April 27, 2006 conference call with analysts. ACS President & CEO, defendant King, stated that "we do not believe that there has been any intentional granting of look-back stock options to executive officers and directors, and we believe our grants have complied with the terms of our stock options plan." Defendant King also stated that the options controversy was a "procedural matter" that the Company would sort out quickly.

8.     Only two weeks later, on May 10, 2006, ACS announced that it could not file its First Quarter Form 10-Q 2006 financial results with the SEC and that ACS would be required to take a charge of approximately *$40 million* because it did not properly account for backdated options. The Company also announced that ACS had begun an internal investigation into stock

6

option practices through its regular outside counsel at the direction of the entire ACS Board of Directors.  ACS also reiterated that it was the subject of an SEC investigation.  Despite these disclosures, the Company again sought to downplay any wrongdoing and dismiss the possibility that any backdating had occurred:

> Historically, the Company has granted stock options principally utilizing a process whereby its compensation committee or special compensation committee, as applicable, would approve stock option grants through unanimous written consents with specified effective dates that *generally preceded the date on which the consents had been executed* by all members of the applicable compensation committee.

> \*      \*      \*

> *Notwithstanding the Company's accounting determination noted above*, the Company believes that (i) its historical written consent effective date process is permitted under the Company's current and predecessor stock option plans and Delaware corporate law, (ii) the Company has consistently followed this process in prior accounting periods, and (iii) in many cases, the grants in question had been verbally discussed and approved by each of the members of the applicable compensation committee on a relatively contemporaneous basis with the specified effective date of those grants.

ACS Form 8-K, dated May 10, 2006 (emphasis added).

9.      Just seven days after the Company's May 10, 2006 announcement, ACS received a grand jury subpoena issued by the United States District Court for the Southern District of New York requesting that the Company produce documents relating to its granting of stock options from 1998 through the present.

10.      Then, on August 7, 2006, ACS *retracted* its May 10, 2006 statement, effectively abandoning its claims that stock options had not been backdated, stating that "previously disclosed preliminary findings regarding" suspected options malfeasance "can no longer be relied upon" because the Company's prior statements would be "superseded by" ACS's disclosure of the result of an internal investigation in September 2006, including a potential

restatement of reported financial results.  On September 14, 2006, ACS disclosed that its 2006 report on Form 10-K will be delayed due to the Company's investigation of stock option pricing.

11.   The backdating at ACS violated ACS's publicly-disclosed and shareholder-ratified 1988 and 1997 Stock Option Plans, which provided that incentive stock option grants to employees be priced at not less than the fair market value of ACS common stock on the date of the grant, and rendered ACS's 1995-2006 Proxy Statements, 1996-2005 Forms 10-K and 1994 initial public offering Registration Statement and Prospectus false and misleading.  Stock options backdating at ACS was thus in breach of Defendants' fiduciary duties of good faith, fair dealing and loyalty to Plaintiffs and Plan Participants.

12.   The conduct complaint of herein has unjustly enriched certain of ACS's top executives including defendant Rich, to the detriment of Plaintiffs and Plan Participants.  A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price.  Backdating options such that they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start.  For example, if a company grants options on May 22, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a riskless profit.

13.   ACS has been exposed to a costly investigation by the SEC, a subpoena from the United States Department of Justice, as well as potentially costly and expensive lawsuits for violations of the federal securities laws and accounting rules applicable to public companies.  As former SEC Chairman Harvey Pitt explained, "backdating" plainly violates both the federal securities laws and state corporate fiduciary laws:

What's so terrible about backdating options grants?

For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value.

But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders. For another, backdating means a corporate document used to permit access to corporate assets has been falsified, a violation of the Foreign Corrupt Practices Act.

Moreover, if backdating occurs without the compensation committee's knowledge, illegal insider trading may also have occurred. Securities law violations are not the only potential problems with backdating options grants. Backdating may violate the Internal Revenue Code, and companies may not be able to deduct the options payments. On the state level, backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity.

*     *     *

More fundamentally, the financial statements of a company that has engaged in backdating may require restatement. The options may not be deductible, and the expenses, as well as the various periods to which they may have been allocated, may also be incorrect. . . .

More to the point, what does this kind of conduct say about those who do it and those who allow it to occur (either wittingly or unwittingly)?

Those who backdate options grants violate federal and state law. And those on whose watch this conduct occurs are also potentially liable: If they knew about the backdating, they're participants in fraudulent and unlawful conduct. If they didn't know about the backdating, the question will be: Should they have done more to discover it?

Harvey Pitt, "The Next Big Scandal," Forbes.com, May 26, 2006.

Chairman Pitt further opined that:

Options backdating calls a company's internal controls into question. Many discussions of backdating start with the observation that backdating is not, per se, illegal. That is wrong. Options backdating frequently involves falsification of records used to gain access to corporate assets. . . . If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. Backdating is not only illegal and unethical, it points to a lack of integrity in a company's internal controls.

Harvey Pitt, "Lessons of the Stock Options Scandal,"

Financial Times, June 2, 2006.

14.    Lynn Turner, the SEC's former Chief Accountant, described undisclosed backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line." Arthur Levitt, former Chairman of the SEC, described backdating as stealing: "It is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."

15.    The scheme to back date executive stock option grants at the Company as complained of herein has not only surreptitiously and illegally lined Defendants' pockets and caused ACS to issue materially false financial statements, but has undermined the key purpose of stock option-based executive compensation, i.e., to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, ACS insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition – a situation which President George W. Bush recently declared "bad for America": "[O]ver compensating or trying to *backdate things is . . . bad for America*. And there ought to be consequences when people don't tell the truth and are not transparent." (emphasis added).

16.    Moreover, as a result of the scheme to back date executive stock option grant complained of herein, ACS's proxy materials filed with the SEC during the Class Period have been false and misleading, ACS may be in violation of certain provisions of the Internal Revenue Code since it may not be able to deduct the options payments from its taxable income and the Company has been forced to take a $40 million charge because it improperly accounted for its option grants. The Company is also required to formally restate its reported earnings for certain years.

17.    On November 27, 2006, ACS announced the completion of the Company's internal investigation into its historical stock option practices and the actions it is taking in response to the findings of the investigation. As a result of the internal investigation, it was determined that the accounting measurement dates used in pricing certain option grants were incorrect.

18.    But even the November 27, 2006 admission that the accounting measurement dates used in pricing certain option grants were incorrect has not ended the litany of ACS's serious problems arising from the scandal of backdating executive stock option grants at the Company. Indeed, the value of ACS Common Stock in the Plan account has been, and continues to be, significantly devalued as a cloud continues to hover over the Company because of as yet-answered questions about the propriety of the Company's executive stock option practices. While a proposed takeover offer for the Company (since dropped) has supported the market price of ACS common stock throughout most of 2007, the Participants have nonetheless loss significant amounts of their retirement savings due to Company's questionable if not unlawful executive stock option practices.

## JURISDICTION AND VENUE

19.    **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

20.    **Personal Jurisdiction**: ERISA provides for nation wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Texas. Defendant ACS has its headquarters within this district.

21.    **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1 132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district.

## PARTIES

22.    Plaintiff Terri Siméon is a resident of the State of New York. Plaintiff Siméon was a participant in the Plan and held ACS common stock in her individual account under the Plan during the Class Period. Plaintiff Siméon has suffered a loss in her individual account under the Plan during the Class Period in connection with her holding of units of the ACS Stock Fund.

23.    Plaintiff Kyle Burke is a resident of the State of Maryland. Plaintiff Burke was a participant in the Plan and held ACS common stock in his individual account under the Plan, and Plaintiff Burke continues to hold ACS common stock in his individual account under the Plan. Plaintiff Burke has suffered a loss in his individual account under the Plan in connection with his holding of units of the ACS Stock Fund.

24.    Defendant ACS is a Delaware corporation with its principal place of business at 2028 North Haskell Avenue, Dallas, Texas, 75204. ACS is a Fortune 500 and S&P 500 company with approximately 52,000 employees. The Company provides business process and information technology outsourcing solutions to commercial and government clients. Among

other things, the Company operates the E-Z Pass programs in New York and New Jersey, the largest electronic toll collection programs in the world.  In addition, the Company's largest contract is with the United States Department of Education, which contract involves loan servicing, loan processing, debt collection and portfolio management services.

25.    ACS was a fiduciary of the Plan because it was the sponsor of the Plan; because it was a "named fiduciary" under the governing Plan document; because it "maintained" and was the Administrator of the Plan under the governing Plan document,[1] and because it disseminated to Participants the Summary Plan Descriptions (individually and collectively, "SPD").[2]

---

[1] The governing Plan document throughout most of the Class Period was the ACS Savings Plan (Amended and Restated effective July 1, 2004), which has been produced to Plaintiffs in this action and designated ACS 00298 *et seq.*  Article 2.2 of the governing Plan document states that "[t]he Employer shall be the Administrator." Article 1.38 of the governing Plan document defines "Named Fiduciary" as the "Employer" and as the "Administrator." "Employer" is defined as Affiliated Computer Services, Inc. and its successors and predecessors in the maintenance of the Plan (Article 1.19).  The governing Plan document also defines "Administrator" to "mean [t]he Employer unless another person or entity has been designated . . . ."  As discussed herein, the Affiliated Computer Services, Inc. Administrative Committee Charter (ACS 00576 *et seq.*) provides that the Company has designated the ACS Administrative Committee as another named fiduciary of the Plan.

[2] For example, Section 2.3(j) of the governing Plan document provides in relevant part:

> "[T]he primary responsibility of the Administrator [ACS] is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan . . . the Administrator shall be charged with the duties of the general administration of the Plan, including, but not limited to, the following:
>
> \*        \*        \*
>
> (j) **to act as the Named Fiduciary responsible for communications with Participants** as needed to maintain Plan compliance with ERISA Section 404(c), including but not limited to the receipt and transmitting of Participant's directions as to the investment of their account(s) under the Plan and the formulation of policies, rules, and procedures pursuant to which Participants may give investment instructions with respect to the investment of their accounts. (ACS 00319) (Emphasis added).

Fiduciaries of the Plan are required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires the Plan's Administrator to furnish to Participants the SPD. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights and obligations under the Plan. The SPD and all information contained or incorporated therein constitute representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of the Plan's assets allocated to their accounts.  Indeed, the SPD transmitted to Participants by and on behalf of ACS during the Class Period specifically encouraged Participants to review the Company's SEC filings in making their investment allocation decisions under the Plan.  For example, the SPD for July 1, 2004 (ACS 00895) states in part:

> The Company files periodic reports and proxy materials with the Securities and Exchange Commission ("SEC") which contain information regarding the Company's business, financial condition and management. *You should review the Company's SEC filings and the information provided below in making a decision whether to direct the Plan trustees to invest your Plan account in Common Stock.*

(Emphasis added).

26.     Defendant the ACS Administrative Committee ("Committee") was a fiduciary of the Plan and one of the named fiduciaries of the Plan during the Class Period.   The Administrative Committee Charter (the "Charter") of the Committee makes clear that the Committee had, and exercised, discretionary authority over the investments of the Plan.  Under the heading "Investment Powers," the Charter imposed on the Committee the duty "to establish that the requirements of ERISA are satisfied with respect to Plan investments."  (Investment Power A, at ACS 00579).  Indeed, the Charter refers to the Committee as the Plan's "principal

ERISA fiduciary" and provides that the Committee was to establish the Plans "investment policy and monitor [] investment performance." (ACS 00589).

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action in part as a class action pursuant to Rules 23(a) and (b)(l) and (3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all Participants in the Plan for whose individual accounts the Plan purchased and/or held shares of ACS common stock (whether in the form of shares of common stock or units of the ACS Stock Fund) at any time during the Class Period (December 31, 1998, through the present).

28.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class in that ACS's public statements represent that it had approximately 52,000 employees during the Class Period, and a substantial number of these employees were Participants in the Plan for whose account the Plan held ACS common stock in the form of ACS Stock Fund.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants were fiduciaries of the Plan and/or the Participants;

(b)     whether Defendants breached their fiduciary duties;

(c)     whether the Plan and the Participants were injured by such breaches; and

(d)    whether the Class is entitled to recoup its losses and injunctive relief

30.    Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiff and members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

31.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.

32.    Plaintiffs have retained competent counsel.    Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

33.    Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

34.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

35.    The Plan is an employee benefit Plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

36.    The Plan is a "defined contribution" or "individual account" Plan with the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participants account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such participant's accounts. Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account.

37.    The Plan is a voluntary contribution Plan whereby Participants direct the Plan to purchase investments from among the investment options available in the Plan and allocate them to Participants' individual accounts.

38.    During the Class Period, one of the investment options available to Participants was the ACS Stock Fund. The governing Plan document (Article 4.13(a), at ACS 00347) describes the ACS Stock Fund as follows:

> The ACS Stock Fund consists primarily of Affiliated Computer Services, Inc. Class A common stock. The ACS Stock Fund also includes cash or short-term liquid investments in amounts designed to satisfy daily Participant exchange or withdrawal requests. A Participant's interest in the ACS Stock Fund will be denominated as "units." Shares of Company stock held in the ACS Stock Fund and dividends and other distributions on Company stock shall not be specifically allocated to Participants' accounts. The value of a unit will fluctuate based upon various factors, including the market value of and dividends paid on Company stock, earnings and losses on cash or cash equivalent investments held in the ACS Stock Fund, ACS Stock Fund expenses and Plan administration expenses allocated to the ACS Stock Fund.

39.    While the governing Plan document describes the Plan investment known as the ACS Stock Fund, there was no requirement in the Plan that the ACS Stock Fund be offered to Participants as an investment option under the Plan and there was no requirement in the Plan that Plan assets be held or invested in the ACS Stock Fund. Indeed, to the contrary, the governing

17

Plan document, consistent with ERISA, provided that, even if Participants designated the ACS

Stock Fund as their chosen Plan investment, the Company could refuse the Participants'

instructions and not invest the Participants' retirement savings in the ACS Stock Fund. Article

4.12(e) of the governing Plan document states:

> Notwithstanding any other provision of the Plan to the contrary, the
> Administrator shall have the authority to decline investment instructions
> of Participants or Beneficiaries where it deems appropriate and may
> exercise this authority if it Plan believes it would be imprudent not to do
> so in fulfilling its fiduciary role under ERISA.

40.    The governing Plan document thus provided the fiduciaries of the Plan -- the

Defendants in this case -- with the express authority to reject Participant instructions to invest

their retirement savings in the ACS Stock Fund. More significantly, the fiduciary duties imposed

upon Defendants by ERISA required that Defendants refuse to allow the investment of Plan

assets in the ACS Stock Fund during the Class Period in this case. As alleged herein, the

impermissible and unlawful backdating of executive stock options at ACS has exposed the

Company to regulatory investigations, civil litigation, tax liabilities in amounts not yet computed

or assessed, adverse publicity and the loss of investor confidence in the Company's senior

management and Board of Directors. Due to these consequences of the impermissible

backdating of executive stock options at ACS, the value of ACS common stock, including as a

component of units of the ACS Stock Fund, has been substantially diminished.

41.    Notwithstanding the fact that the fiduciary duties imposed by ERISA required the

Plan's fiduciaries to prohibit investment of capital Plan assets in the ACS Stock Fund, during the

Class Period, the Plan maintained large holdings of the ACS Stock Fund. For example, the

Plan's 2004 Form 11-K represents, among other things:

> The Plan is a defined contribution plan wherein participants elect to
> reduce their compensation and have such reductions contributed to the
> Plan on their behalf. Generally, the Plan covers all eligible employees of

the Company who elect to participate except those who are leased or are nonresident aliens not receiving United States source income. The Plan also allows for rollovers from other plans.

Participating employees may contribute up to the lesser of 18% (30% for employees of ACS Health Administration, Inc. hired prior to April 1, 2003) of covered compensation through payroll deductions or the maximum amount permitted under applicable Internal Revenue Service provisions. The Company may make a discretionary matching contribution each pay period to the Plan based on a percentage of the participant's compensation and Company profitability as decided by the Company's Board of Directors.

\*      \*      \*

Company matching contributions are made to the ACS Stock Fund. Participants may exchange out of the ACS Stock Fund at any time with no restrictions.

\*      \*      \*

The Plan maintains the following investments representing 5% or more of the net assets available for benefits at December 31, 2004 and 2003:

|  | 2003 | 2004 |
|---|---|---|
| Fidelity Growth Company Fund | $58,469,211 | $37,498,736 |
| Fidelity Low-Priced Stock Fund | $46,867,705 | $29,305,865 |
| Fidelity Money Market Trust Retirement | $88,254,225 | $68,983,696 |
| Fidelity Spartan US Equity Index Fund | $36,609,675 | $22,400,042 |
| ACS Stock Fund | $49,631,131 | $37,279,579 |

42.    Since the 2004 Form 11-K represents that the net assets available for benefits at December 31, 2004, and December 31, 2003, were $458,185,809 and $309,387,966, respectively, at year-end 2004, approximately 11% of the Plan's assets were invested in ACS

common stock fund, and at year-end 2003, approximately 12% of the Plan's assets were invested in ACS common stock. However, as alleged herein, ACS common stock was not a prudent retirement investment under the Plan during the Class Period, including at year-end 2004 and year-end 2003, because of the serious, then-undisclosed improprieties engaged by the Company with respect to the back dating executive stock options.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

43.    Pursuant to ERISA § 404, fiduciaries have a duty to discharge their duties with respect to the Plan prudently and solely in the interest of Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and their beneficiaries. A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable and proper option for the Plan. The selection, monitoring and continuation of the investment alternatives under the Plan were subject to the above described fiduciary duties.

44.    Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), the Plan's fiduciaries had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like character and of like aims, and to diversify investment in the Plan so as to minimize the risk of large losses.

45.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable

to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

46.    Companies typically provide two types of pensions Plan: (a) a "defined benefit" plan where the amount of an employee's retirement benefit is a direct obligation of the company which is a set amount (typically based on salary while employed and number of year of employment); and (b) a "defined contribution" plan, such as a 401(k) plan, where the retirement benefit is based solely on the amount invested and the earnings made in an employee's plan account. Fiduciaries of defined benefit Plan, who invest or actively supervise the investment of plan assets, are liable under ERISA for imprudent investments made by the plan, and are liable for and must make good to the plan any losses suffered by the plan and any loss of benefits suffered by beneficiaries as a result of imprudent investments. Fiduciaries of defined contribution Plan are similarly liable under ERISA § 404(a), 29 U.S.C. § 1104(a), for imprudent investments made by a plan, even where the investment choice is selected by the participant, unless the plan and the fiduciaries comply with the strict requirements of ERISA § 404(c), 29 U.S.C. § 1104(c). Where the plan and fiduciaries do not comply with section 404(c), then the fiduciaries' liability for imprudent investments is the same as the liability of a fiduciary of a traditional pension plan.

47.    Fiduciaries can shift liability for imprudent investments to fiduciaries under Section 404(c) if, among other things, they meet four specific requirements:

(a)    they disclose in advance the intent to shift liability to participants;

(b)    they ensure that participants are not subject to undue influence;

(c)    they disclose to participants all material information necessary for

21

participants to make investment decisions that they are not precluded from disclosing under other applicable law.   In this regard, fiduciaries have a choice B, they can disclose all material information to participants, including information that they are not required to disclose under the securities laws, and shift liability to participants, or they can comply with the more limited disclosure requirement under the securities laws, but remain liable for imprudent investments. 29 C.F.R. § 2550.404-l(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

48.    Defendants ACS and the Committee failed to shift liability to Participants for imprudent investment decisions under section 404(c) in that: (i) they failed to disclose in a fiduciary capacity all material information that they were not precluded from disclosing under other applicable law and which was necessary for Participants to make informed investment decisions; (ii) they failed to provide an adequate description of the investment objectives and risk and return characteristics of the funds; and (iii) they failed to ensure that Participants were not subject to undue influence, and indeed themselves subjected Participants to undue influence.

49.    The governing Plan document, moreover, makes clear that the fiduciaries of the Plan had discretionary authority to refuse to invest the Participants' retirement savings in the ACS Stock Fund, including if they "believe[d] it would be imprudent not to do so in fulfilling [their] fiduciary role under ERISA."   (Article 4.12(e) at ACS 00347).   The improper and unlawful backdating of executive stock options at ACS has, foreseeably, caused such damage to the Company and such a diminution in the value of ACS common stock (including ACS common stock as a component of units of the ACS Stock Fund) that the Defendants in this case were not only authorized to refuse Participant directions to invest in the ACS Stock Fund, they were required to so refuse by the duties of prudence and loyalty and other obligations imposed by ERISA.

50.     That Defendants could have refused the Participants' directions to invest in Company stock is not only clear from the governing Plan document (Article 4.12(e) at ACS 00347, discussed above) but from communications to Participants.  One such communication, a letter addressed "Dear ACS Associate" (ACS 00869, at 00878), noted that Participant directions to sell the ACS Stock Fund might be delayed or "suspended" under certain circumstances, and further, that "[i]n unusual circumstances, the [f]und [the ACS Stock Fund] may be closed to purchases or sales."

51.     The Defendant fiduciaries of the Plan thus had ample discretion to divert the Participants' directions to purchase the ACS Stock Fund into other more suitable investments and had the duty to so diversify Participants out of the ACS Stock Fund.  Defendants failed to properly diversify Participants out of the ACS Stock Funds as permitted by the Plan and as required by ERISA.

## SUBSTANTIVE ALLEGATIONS

52.     ACS provides diversified business process outsourcing and information technology services and solutions to commercial and governmental clients worldwide.  Between 1995 and 2005, ACS grew rapidly from a small technology firm into one with more than $4.4 billion in annual revenues.  Based in Dallas, Texas, ACS has over 54,000 employees in Texas and elsewhere.

53.     Between 1995 and 2005, ACS granted stock options for the purchase of millions of shares of the Company's common stock to its top executives, including too many of the directors and senior ACS officers named as Defendants herein.  In its public filings, including in the ACS 1994 initial public offering prospectus and proxy statements, containing shareholder-approved stock option plans, ACS represented that the exercise price of all of the incentive stock

options would be not less than the fair market value of the price of ACS common stock, which the Company repeatedly stated is the stock's closing price on the date of the grant. See, e.g., 1994 Prospectus at 40; 1996 Proxy at 11; 1997 Proxy at 26-27. During the Class Period, stock options were granted by the ACS Board of Directors pursuant to the 1988 Stock Option Plan and the 1997 Stock Option Plan.[3]

54.     In connection with ACS's initial public offering of stock, filed a Form S-1 Registration Statement with the SEC on September 27, 1994. ACS's Prospectus was incorporated in the Registration Statement. In the Prospectus, Defendants stated:

> Types of Grants. Subject to adjustment, 1,850,000 of the Company's Class A Common Stock may be issued pursuant to grants under the Stock Option Plan. The Stock Option Plan provides for issuance of incentive stock options within the meaning of Section 422 of the Code ("Incentive Stock Options") . . . .
>
> *            *            *
>
> Options. The exercise price of an Incentive Stock Option ***shall be no less than 100% of the fair market value of the Company's Class A Common Stock at the time of the grant*** . . . . Fair market value is determined by the Compensation Committee in accordance with the terms of the Stock Option Plan. After registration of the Company's Class A Common Stock pursuant to the Registration Statement of which this Prospectus is a part, fair market value will be determined by reference to the stock's closing price on the date of the grant.

1994 Prospectus at 40 (emphasis added). Defendants Deason and Rich signed the Registration Statement.

55.     At all relevant times, the 1988 Stock Option Plan provided, in relevant part:

> The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be the price as is determined by the Board, but shall be subject to the following:

---

[3] The 1988 Stock Option Plan was terminated during fiscal year 1998 in favor of the 1997 Stock Option Plan. See 1998 Form 10-K, Ex. 13.1 at 14.

(i)    In the case of an Incentive Stock Option

\*      \*      \*

(B)    granted to an Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

1996 Proxy, Appendix 1 at 5.

56.    At all relevant times, the 1988 Stock Option Plan defined "Fair Market Value" of ACS common stock "the closing sales price of such stock (or the closing bid, if no sales were reported, as quoted on such system or exchange for the last market trading day prior to the time of determination) as reported in <u>The Wall Street Journal</u> or such other source as the Administrator deems reliable." 1996 Proxy, Appendix 1 at 2.

57.    On or about September 30, 1996, the ACS Board of Directors recommended to shareholders that they approve amendments to the 1988 Stock Option Plan, including authorizing the granting of additional shares that could be awarded to executives. The Board told shareholders in the 1996 Proxy that "[t]he purpose of the Stock Option Plan is to provide the Company with an effective means to attract and retain highly qualified personnel as well as to provide additional incentive to employees and others who provide services to the Company and who can contribute significantly to the Company's success." 1996 Proxy at 10.

58.    On August 5, 1997, the ACS Board adopted the 1997 Stock Option Plan, subject to shareholder approval. The 1997 Stock Incentive Plan, provides, in pertinent part, as follows:

"FAIR MARKET VALUE" means, as of any date, the value of Common Stock determined as follows:

(i)    If the Common Stock is listed on any established stock exchange or a national market system including, without limitation, the New York Stock Exchange ("NYSE") its Fair Market Value shall be the closing sales price for such stock . . . as reported in the <u>Wall Street Journal</u> or such other source as the Administrator deems reliable.

\*      \*      \*

25

The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be the price as is determined by the Board, but shall be subject to the following:

(i)    In the case of an Incentive Stock Option

*    *    *

(B)    granted to any other Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

1997 Proxy, Appendix D at D-5 – D-6.

59.    On or about November 14, 1997, the ACS Board recommended to shareholders that they approve the 1997 Stock Option Plan. In describing the 1997 Stock Option Plan, they expressly stated "the exercise price . . . shall be no less than 100% of the fair market value of ACS Class A Common Stock at the time of the grant," and that "the 1997 Plan reflects competitive practices and is necessary to attract and retain the best available personnel and promote the success of ACS's business and recommends its approval by the ACS stockholders." 1997 Proxy at 26-27.

60.    Contrary to the foregoing public disclosures, the options granted under these plans were highly favorable to the option recipients because the stock options were not granted at the "fair market value" on the date of grant, but were in fact backdated. In many instances, the stock options were allegedly granted just before a sharp increase in the trading price of ACS stock or at the bottom of a steep drop in stock's price. In fact, according to ACS's spokeswoman Lesley Pool, stock option grants to ACS's executives were given "when there was a natural dip in the stock price."

61.    The practice of backdating options at ACS commenced prior to the passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes"), when options grants did not have to be reported to the SEC until 45 days after the close of the fiscal year in which the options were granted. For

example, Senior Executive Jeffrey A. Rich received six grants between 1995 and 2002 at lows in the Company's stock price. For example:

(a)     ACS made one stock option grant to Defendant Rich in 1995, a grant of 444,100 options  purportedly on March 9, 1995. On March 9, 1995, ACS stock closed at $5.63, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $5.09 to a high of $9.53 during 1995:



(b)     ACS made one stock option grant to Defendant Rich in 1996, a grant of 400,000 options purportedly on March 8, 1996. On March 8, 1996, ACS stock closed at $8.44,

at the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price

increase.  ACS stock traded in a range from a low of $8.44 to a high of $15.88 during 1996:



(b)     ACS made one stock option grant to Defendant Rich in 1997, a grant of

120,000 options purportedly on April 7, 1997.  On April 7, 1997, ACS stock closed at $10.57,

near the bottom of a harp dip in the price of ACS common stock, and preceding a sharp price

increase.  ACS stock traded in a range from a low of $9.81 to a high of $15.00 in 1997:



(d)     ACS made one stock option grant to Defendant Rich in 1998, a grant of 500,000 Options purportedly on October 8, 1998.  On October 8, 1998, ACS stock closed at $11.53, at the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price increase.  ACS stock traded in a range from a low of $11.53 to a high of $22.50 during 1998:



(e)     ACS made one stock option grant to Defendant Rich in 2000, a grant of

200,000 options purportedly on July 11, 2000.  On July 11, 2000, ACS stock closed at $16.44,

near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price

increase.  ACS stock traded in a range from a low of $15.66 to a high of $30.75 during 2000:



(f)    ACS made one stock option grant to Defendant Rich in 2002, a grant of

400,000 options purportedly on July 23, 2002.  On July 23, 2002, ACS common stock closed at

$35.75, near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp

increase.  ACS stock traded in a range from a low of $33.88 to a high of $56.75 during 2002:



62.    According to <u>The Wall Street Journal</u>, the statistical likelihood of the options granted to Rich from 1995 to 2002 occurring by chance on the dates when the prices of ACS stock was so low, and hence so favorable to Rich, would be *1 in 300 billion*:

> For instance, Affiliated Computers Services Inc. reported an option grant to its then-president, Jeffrey Rich, dated Oct. 8, 1998.  In the succeeding 20 trading days – equal to roughly a month – ACS stock rose 60.2%.  That huge gain was the best 20-trading-day performance all year for ACS.  So the Journal ranked Oct. 8 No. 1 for ACS for 1998.
>
> It is very unlikely that several grants spread over a number of years would fall on high-ranked days.

But all six of Mr. Rich's did. Another of his option grants also fell on the No. 1-ranked day of a year, March 9, 1995. Two grants fell on the second-ranked day, those in 1996 and 1997. In 2002, his options grant was on the third-ranked day of the year, and in 2000, his grant came on the fourth-ranked day.

\*    \*    \*

For Mr. Rich's grants, the Journal's methodology puts the overall odds of a chance occurrence at about *one in 300 billion – less likely than flipping a coin 38 times and having it come up "heads" every time*.

(Emphasis added).

63.    Other ACS directors and top officers also received improperly backdated stock option grants. For example:

(a)    On April 7, 1997, ACS purportedly made a grant of 80,000 options to Senior Executive Mark A. King. Defendant King. On April 7, 1997, ACS stock closed at $10.57, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $9.81 to a high of $15.00 during 1997:



(b)    On May 18, 1998, ACS purportedly made a grant of 40,000 options to King.  On May 18, 1998, ACS stock closed at $15.94, at the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase.  ACS stock traded in a range from a low of $11.53 to a high of $22.50 during 1998:



(c)     On October 8, 1998, ACS purportedly made a grant of 100,000 options to King. On October 8, 1998, ACS stock closed at $11.53, at the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $11.53 to a high of $22.50 during 1998:



(d)     On September 13, 1999, ACS purportedly made a grant of 50,000 options to King.  On September 13, 1999, ACS stock closed at $19.50, on unusually high trading volume and at the bottom of a sharp drop in the price of ACS common stock.  ACS stock soon traded at $23 per share:



(e)    On July 11, 2000, ACS purportedly made a grant of 100,000 options to
King.  On July 11, 2000, ACS stock closed at $16.44, near the bottom of a sharp dip in the price
of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a
low of $15.66 to a high of $30.75 during 2000:

37



(f)      On July 23, 2002, ACS purportedly made a grant of 600,000 options to King.  On July 23, 2002, ACS stock closed at $35.75, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase.  ACS stock traded in a range from a low of $33.88 to a high of $56.75 during 2002:



64.    As a result of the backdating of stock options issued to Rich King, and ACS's other top insiders, ACS' senior executives have been unjustly enriched at the expense of the Plan and Plan Participants.  These windfall profits have made ACS' senior executives some of the highest paid executives in the business process outsourcing industry.

65.    Moreover, throughout the Class Period, Rich and other ACS executives exercised many of these stock options permitting them to sell over millions worth of ACS stock they obtained.  For example, details of the stock sales by King and Rich are set forth in the chart below:

39

| Mark King | 4/30/2001 | 80,028 | $35.56 | $2,845,796 |
| | 5/21/2002 | 80,000 | $55.22 | $4,417,600 |
| | 5/21/2002 | 2,000 | $54.70 | $109,400 |
| | 5/29/2002 | 2,000 | $55.20 | $110,400 |
| | 6/4/2002 | 2,000 | $53.76 | $107,520 |
| | 6/11/2002 | 2,000 | $54.94 | $109,880 |
| | 6/18/2002 | 2,000 | $54.08 | $108,160 |
| | 11/7/2002 | 26,000 | $50.00 | $1,300,000 |
| | 11/25/2002 | 16,000 | $50.00 | $800,000 |
| | 11/27/2002 | 4,000 | $50.00 | $200,000 |
| | 12/4/2002 | 200,050 | $50.00 | $10,002,500 |
| | 12/19/2002 | 4,000 | $50.00 | $200,000 |
| | 12/24/2002 | 2,000 | $50.95 | $101,900 |
| | 12/31/2002 | 2,000 | $52.45 | $104,900 |
| | 1/7/2003 | 2,000 | $55.55 | $111,100 |
| | 1/14/2003 | 2,000 | $54.80 | $109,600 |
| | 1/22/2003 | 2,000 | $51.91 | $103,820 |
| | 1/28/2003 | 2,000 | $51.80 | $103,600 |
| | 4/23/2003 | 3,000 | $50.00 | $150,000 |
| | 5/612003 | 25,000 | $50.00 | $1,250,000 |
| | 51/3/2003 | 2,000 | $52.55 | $105,100 |
| | 5/20/2003 | 1,000 | $50.00 | $50,000 |
| | 1/2/2004 | 10,300 | $55.20 | $568,560 |
| | 1/2/2004 | 4,900 | $55.40 | $271,460 |
| | 1/2/2004 | 4,600 | $55.15 | $253,690 |
| | 1/2/2004 | 3,000 | $55.00 | $165,000 |
| | 1/2/2004 | 3,000 | $55.03 | $165,090 |
| | 1/2/2004 | 100 | $55.25 | $5,525 |
| | 1/2/2004 | 100 | $55.47 | $5,547 |
| | 1/5/2004 | 10,000 | $56.00 | $560,000 |
| | 1/6/2004 | 2,000 | $56.82 | $113,640 |
| | 1/13/2004 | 2,000 | $56.50 | $113,000 |
| | 1/21/2004 | 2,000 | $55.41 | $110,820 |
| | 1/30/2004 | 2,000 | $55 | $110,200 |
| | 4/20/2004 | 10 | 5,000 | $275,000 |
| | 9/112004 | 800 | $54.76 | $43,808 |
| | 9/1/2004 | 600 | $54,76 | $32,856 |
| | 9/1/2004 | 600 | $54.75 | $32,850 |
| | 9/212004 | 24,000 | $54.82 | $1,315,680 |
| | 912/2004 | 6,000 | $54.75 | $328,500 |
| | 9/2/2004 | 2,700 | $54.75 | $147,825 |
| | 9/2/2004 | 1,300 | $54.76 | $71,188 |
| | 9/14/2004 | 2,000 | $55.75 | $111,500 |
| | 9/21/2004 | 2,000 | $57.07 | $114,140 |
| | 9/28/2004 | 2,000 | $54.75 | $109,500 |
| | 10/4/2004 | 50,000 | $60.08 | $3,004,000 |
| | 10/5/2004 | 2,000 | $60.14 | $120,280 |
| | 10/12/2004 | 2,000 | $57.85 | $115,700 |
| | 10/19/2004 | 2,000 | $57.12 | $114,240 |
| | 11/1/2004 | 2,000 | $54.75 | $109,500 |
| | 11/2/2004 | 2,000 | $54.95 | $109,900 |
| | 11/9/2004 | 2,000 | $57.81 | $115,620 |
| | 11/16/2004 | 2,000 | $59.18 | $118,360 |
| | 11/23/2004 | 2,000 | $59.31 | $118,620 |
| | 11/30/2004 | 2,000 | $59.32 | $118,640 |
| | 12/7/2004 | 2,000 | $60.13 | $120,260 |

|  |  |  |  |
|---|---|---|---|
| 1211412004 | 2,000 | $59.40 | $118,800 |
| 12/21/2004 | 2,000 | $58.11 | $116,220 |
| 12/28/2004 | 2,000 | $59.88 | $119,760 |
| 1/4/2005 | 2,000 | $58.13 | $116,260 |
| 1/11/2005 | 2,000 | $57.89 | $115,780 |
| 1/19/2005 | 2,000 | $56.33 | $112,660 |
| **Total:** | **636,078** |  | **$32,391,255** |

Jeffrey Rich

|  |  |  |  |
|---|---|---|---|
| 8/2/1996 | 50,000 | $13.93 | $696,500 |
| 11/12/1998 | 10,000 | $19.22 | $192,200 |
| 5/17/1999 | 12,000 | $19.97 | $239,640 |
| 8/4/2000 | 90,000 | $24.26 | $2,183,400 |
| 10/27/2000 | 71,200 | $27.92 | $1,987,904 |
| 10/30/2000 | 28,800 | $27.52 | $792,576 |
| 4/25/2001 | 25,800 | $34.67 | $894,486 |
| 4/26/2001 | 74,200 | $34.68 | $2,573,256 |
| 5/23/2001 | 100,000 | $35.81 | $3,581,000 |
| 7/3/2001 | 4,000 | $36.20 | $144,800 |
| 7/10/2001 | 4,000 | $36.15 | $144,600 |
| 7/17/2001 | 4,000 | $38.00 | $152,000 |
| 7/24/2001 | 4,000 | $39.65 | $158,600 |
| 7/31/2001 | 4,000 | $42.75 | $171,000 |
| 8/7/2001 | 4,000 | $39.16 | $156,640 |
| 8/14/2001 | 4,000 | $40.85 | $163,400 |
| 8/21/2001 | 4,000 | $41.18 | $164,720 |
| 8/28/2001 | 4,000 | $43.01 | $172,040 |
| 10/2/2001 | 4,000 | $39.55 | $158,200 |
| 10/9/2001 | 4,000 | $43.70 | $174,800 |
| 10/16/2001 | 4,000 | $44.40 | $177,600 |
| 10/23/2001 | 4,000 | $46.15 | $184,600 |
| 10/30/2001 | 4,000 | $44.75 | $179,000 |
| 11/5/2001 | 100,000 | $46.15 | $4,615,000 |
| 11/6/2001 | 4,000 | $46.40 | $185,600 |
| 11/13/2001 | 4,000 | $45.75 | $183,000 |
| 11/20/2001 | 4,000 | $48.00 | $192,000 |
| 11/27/2001 | 4,000 | $47.60 | $190,400 |
| 12/4/2001 | 4,000 | $47.00 | $188,000 |
| 12/11/2001 | 4,000 | $48.50 | $194,000 |
| 12/18/2001 | 4,000 | $50.50 | $202,000 |
| 12/26/2001 | 4,000 | $51.72 | $206,880 |
| 1/2/2002 | 4,000 | $52.14 | $208,560 |
| 1/8/2002 | 4,000 | $52.60 | $210,400 |
| 1/16/2002 | 4,000 | $53.47 | $213,880 |
| 1/22/2002 | 4,000 | $51.50 | $206,000 |
| 1/29/2002 | 4,000 | $44.92 | $179,680 |
| 2/5/2002 | 4,000 | $46.16 | 184,640 |
| 2/12/2002 | 4,000 | $46.80 | $187,200 |
| 2/19/2002 | 4,000 | $47.07 | $188,280 |
| 2/26/2002 | 4,000 | $46.42 | $185,680 |
| 3/5/2002 | 4,000 | $51.35 | $205,400 |
| 3/12/2002 | 4,000 | $52.18 | $208,720 |
| 3/19/2002 | 4,000 | $56.00 | $224,000 |
| 3/26/2002 | 4,000 | $53.50 | $214,000 |
| 4/2/2002 | 4,000 | $55.76 | $223,040 |
| 4/9/2002 | 4,000 | $53.63 | $214,520 |

| | | | |
|---|---|---|---|
| 4/16/2002 | 4,000 | $50.55 | $202,200 |
| 4/23/2002 | 4,000 | $54.06 | $216,240 |
| 4/30/2002 | 4,000 | $54.07 | $216,280 |
| 5/7/2002 | 4,000 | $52.01 | $208,040 |
| 5/14/2002 | 4,000 | $52.64 | $210,560 |
| 5/21/2002 | 4,000 | $54.78 | $219,120 |
| 5/28/2002 | 4,000 | $55.70 | $222,800 |
| 6/4/2002 | 4,000 | $53.63 | $214,520 |
| 6/11/2002 | 4,000 | $54.55 | $218,200 |
| 6/18/2002 | 4,000 | $53.82 | $215,280 |
| 6/25/2002 | 4,000 | $46.73 | $186,920 |
| 7/3/2002 | 4,000 | $45.00 | $180,000 |
| 7/9/2002 | 4,000 | $46.75 | $187,000 |
| 7/17/2002 | 4,000 | $46.17 | $184,680 |
| 7/30/2002 | 8,000 | $45.41 | $363,280 |
| 8/6/2002 | 4,000 | $45.00 | $180,000 |
| 8/13/2002 | 4,000 | $48.00 | $192,000 |
| 8/20/2002 | 4,000 | $48.15 | $192,600 |
| 8/27/2002 | 4,000 | $46.25 | $185,000 |
| 9/4/2002 | 4,000 | $45.00 | $180,000 |
| 9/10/2002 | 4,000 | $46.75 | $187,000 |
| 9/17/2002 | 4,000 | $46.50 | $186,000 |
| 10/3/2002 | 4,000 | $39.22 | $156,880 |
| 10/21/2002 | 16,000 | $45.00 | $720,000 |
| 10/22/2002 | 4,000 | $45.00 | $180,000 |
| 10/22/2002 | 4,000 | $45.41 | $181,640 |
| 10/29/2002 | 4,000 | $45.41 | $181,640 |
| 11/5/2002 | 4,000 | $48.10 | $192,400 |
| 11/12/2002 | 4,000 | $48.15 | $192,600 |
| 11/20/2002 | 4,000 | $45.00 | $180,000 |
| 11/26/2002 | 4,000 | $48.93 | $195,720 |
| 12/10/2002 | 4,000 | $48.60 | $194,400 |
| 12/24/2002 | 4,000 | $52.67 | $210,680 |
| 12/31/2002 | 4,000 | $52.50 | $210,000 |
| 1/7/2003 | 4,000 | $55.50 | $222,000 |
| 1/14/2003 | 4,000 | $54.85 | $219,400 |
| 1/21/2003 | 4,000 | $52.60 | 210,400 |
| 1/28/2003 | 4,000 | $50.46 | $201,840 |
| 2/4/2003 | 4,000 | $50.00 | $200,000 |
| 2/11/2003 | 4,000 | $46.10 | $184,400 |
| 2/19/2003 | 2,000 | $47.75 | $95,500 |
| 2/25/2003 | 2,000 | $45.00 | $90,000 |
| 3/4/2003 | 2,000 | $45.10 | $90,200 |
| 3/11/2003 | 2,000 | $41.75 | $83,500 |
| 3/18/2003 | 2,000 | $46.35 | $92,700 |
| 3/19/2003 | 2,000 | $46.35 | $92,700 |
| 3/25/2003 | 2,000 | $46.73 | $93,460 |
| 4/1/2003 | 2,000 | $44.26 | $88,520 |
| 4/812003 | 2,000 | $41.95 | $83,900 |
| 4/15/2003 | 2,000 | $42.80 | $85,600 |
| 4/15/2003 | 2,000 | $42.80 | $85,600 |
| 4/15/2003 | 2,000 | $42.80 | $85,600 |
| 4/22/2003 | 2,000 | $46.10 | $92,200 |
| 4/29/2003 | 2,000 | $48.20 | $96,400 |
| 5/6/2003 | 2,000 | $49.35 | $98,700 |
| 5113/2003 | 2,000 | $52.54 | $105,080 |

| | | | |
|---|---|---|---|
| 5/20/2003 | 2,000 | $49.90 | $99,800 |
| 5/28/2003 | 2,000 | $47.00 | $94,000 |
| 6/3/2003 | 2,000 | $48.45 | $96,900 |
| 6/10/2003 | 2,000 | $46.70 | $93,400 |
| 6/17/2003 | 2,000 | $48.10 | $96,200 |
| 6/24/2003 | 2,000 | $45.75 | $91,500 |
| 12/15/2003 | 48,100 | $53.24 | $2,560,844 |
| 4/3012004 | 150,000 | $48.49 | $7,273,500 |
| 5/25/2004 | 32,000 | $50.00 | $1,600,000 |
| 5/26/2004 | 12,300 | $50.00 | $615,000 |
| 6/4/2004 | 4,000 | $50.00 | $200,000 |
| 6/7/2004 | 51,700 | $50.05 | $2,587,585 |
| 9/912004 | 100,000 | $55.02 | $5,502,000 |
| 12/14/2005 | 88,042 | $55.14 | $4,854,636, |
| 12/14/2005 | 992 | $55.14 | $54,699 |
| **Total:** | **1,417,134** | | **$60,515,286** |

66.    The practice of backdating stock options not only lined the pockets of ACS's senior executives at the direct expense of the Company, which receives money dollar for dollar, when the options are exercised, but also has caused the Company to take a $40 million charge because it improperly accounted for its option grants subsequent to its initial public offering in 1994 through December 31, 2005. This is because options priced below the stock's fair market value when they are awarded bring the recipient an instant paper gain. Under accounting rule APB No. 25, which ACS said the Company followed between at least 1995-2005, that is the equivalent of additional compensation and thus must be treated as a cost to the Company. ACS did not account as an expense the amount by which the market price of the Company's stock on the actual date the options were issued exceeded the exercise price of the options and thus the Defendants' conduct described herein caused ACS to materially understate senior executive compensation expenses and materially overstate its publicly reported net income and earnings per share.

67.    The ACS Performance-Based Incentive Compensation Program for ACS's executive officers was effective at all relevant times, including 1995-2002. From 1996-2002, the program provided, in pertinent part:

> Executive Officers will be entitled to receive varying ranges of up to
> 250% of their base salaries upon achievement of bonus performance goals
> which include the Company's achievement of four targeted financial
> measures: consolidated revenues, consolidated earnings before interest,
> taxes and depreciation, consolidated pre-tax earnings and consolidated
> earnings per share.    The bonus performance goals have been pre-
> established by the Compensation Committee [Defendants Deason, O'Neill
> and Rossi] for all executive officers other than any executive officer
> whose compensation may exceed $1 million, which other officer's goals
> have been previously established by the Special Compensation Committee
> . . . .

1996 Proxy at 16. The performance goals established by the Compensation Committees were

met every year from 1996-2002. As a result, senior executives Rich, King and others have

received large cash bonuses that were equal to or greatly exceeded their annual salaries. Under

the terms of the Performance-Based Incentive Compensation Program, the bonus performance

goals were based in large part on measures of ACS's financial performance (consolidated

earnings before interest, taxes and depreciation, consolidated pre-tax earnings and consolidated

earnings per share) that would have been adversely affected by proper accounting for the

millions of backdated stock options awarded to ACS senior executives in 1996-2002; proper

accounting for millions of backdated stock options held here resulted in lower consolidated

earnings before interest, taxes and depreciation, consolidated pre-tax earnings and consolidated

earnings per share.

68.    The practice of backdating stock option grants to certain ACS's directors and top

executives remained undisclosed until March 18, 2006, when The Wall Street Journal published

an analysis of stock options granted to CEO Jeffrey Rich. With regard to the option backdating

scheme at ACS, The Wall Street Journal stated, in pertinent part, as follows:

> On a summer day in 2002, shares of Affiliated Computer Services Inc.
> sank to their lowest level in a year. Oddly, that was good news for Chief
> Executive Jeffrey Rich.

His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

*    *    *

Mr. Rich called his repeated favorable option-grant dates at ACS "blind luck." He said there was no backdating, a practice he termed "absolutely wrong." A spokeswoman for ACS, Lesley Pool, disputed the Journal's analysis of the likelihood of Mr. Rich's grants all falling on such favorable dates. But Ms. Pool added that the timing wasn't purely happenstance: "We did grant options when there was a natural dip in the stock price," she said. On March 6, ACS said that the SEC is examining its option grants.

*    *    *

While most of Mr. Rich's stock-option gains were due to rises in ACS stock, the exceptional timing of grants enhanced his take. If his grants from 1995 through 2002 had come at each year's average share price, rather than the favorable dates, he'd have made about 15% less.

An especially well-timed grant, in which Mr. Rich received 500,000 options at $11.53, adjusted for stock splits, was dated Oct. 8, 1998. This happened to be the bottom of a steep plunge in the price. The shares fell 28% in the 20 trading days prior to Oct. 8, and rose 60% in the succeeding 20 trading days.

ACS's Ms. Pool said the grant was for Mr. Rich's promotion to CEO. He wasn't promoted until February 1999. Ms. Pool said there was a "six-month transition plan," and the Oct. 8 option grant was "in anticipation" of his promotion.

Mr. Rich would have fared far worse had his grant come on the day ACS announced his promotion. The stock by then was more than twice as high.

45

The grant wasn't reported to the SEC until 10 months after the stated grant date. Ms. Pool said that was proper under regulations in place at the time.

A special board committee oversaw Mr. Rich's grants. Most years, its sole members were directors Frank Rossi and Joseph O'Neill. Mr. Rossi declined to comment. Mr. O'Neill said, "We had ups and downs in our stock price like any publicly traded stock. If there were perceived low points, would we grant options at that point? Yes."

Mr. Rich said grants were made on the day the compensation committee authorized them, or within a day or so of that. He said he or Chairman Darwin Deason made recommendations to the special board committee about option dates.

69.    The Wall Street Journal further revealed the proceeds reaped by Rich on his well-

timed resignation:

Mr. Rich, who is 45 years old, resigned abruptly as ACS's chief executive on a Thursday in September to "pursue other business interests." Again, his timing was advantageous. *In an unusual separation agreement, the company agreed to make a special payment of $18.4 million, which was equal to the difference between the exercise price of 610,000 of his outstanding stock options and the closing ACS stock price on the day of his resignation.*

But the company didn't announce the resignation that day. On the news the next Monday that its CEO was departing suddenly, the stock fell 6%. *Mr. Rich netted an extra $2 million by cashing in the options before the announcement, rather than on the day of it.*

Mr. Rich said ACS signed his separation agreement on Friday, using Thursday's price for the options payout. He said it waited till Monday to release the news because it didn't want to seem "evasive" by putting the news out late Friday.

(Emphasis added).

70.    On April 27, 2006, ACS hosted a conference call with its shareholders and

analysts. With regard to the recent news concerning the alleged backdating scheme at ACS,

ACS' representative stated, in pertinent part, as follows:

Our [ACS] Compensation Committee has not been opposed to granting stock options when our stock price appeared low relative to its trading history, and in some cases grants have been made when natural dips have

occurred in our stock price.  The Compensation Committee recognizes that meaningful incentives granted through stock options to key executives is critical to building the overall long-term market value of ACS.

*       *       *

Our internal investigation is not complete; but based on the information we have gathered and what we know at this point, I offer the following: First, we do not believe that there has been any intentional granting of look-back stock options to executive officers and directors, and we believe our grants have complied with the terms of our stock options plan.  Of course, this matter is subject to resolution of the SEC investigation, as well as our ongoing internal investigation.  And second, as we have previously said, we do not believe the allegations in the shareholder lawsuit have merit, and we intend to vigorously defend the case.

71.     On May 10, 2006, ACS announced that it would be delaying the filing of its First

Quarter 10-Q 20006 financial results with the SEC.  Contrary to previous reports, ACS now

admitted that certain of its awarded options were dated prior to when they became effective.  As

a result, ACS announced that it would take a $40 million charge for compensation expenses that

were not properly accounted for in prior periods.  Incredibly, in the same breath, ACS sought to

downplay the emerging wrongdoing; its release admitted material facts, yet simultaneously

backtracked, stated, in pertinent part:

At the direction of the Company's Board of Directors, in response to the informal SEC investigation noted above, ACS has commenced an internal investigation through its regular outside counsel into the Company's historical stock option practices, including a review of the Company's underlying option grant documentation and procedures.  Due to the volume of data subject to this review, the Company is unable to complete and file by the prescribed due date its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2006 without unreasonable effort or expense.

*       *       *

Historically, the Company has granted stock options principally utilizing a process whereby its compensation committee or special compensation committee, as applicable, would approve stock option grants through unanimous written consents with specified effective dates that generally preceded the date on which the consents had been executed by all

47

members of the applicable compensation committee. In connection with option grants to senior executives, the historical practice was for the Company's chairman, who during periods prior to September 2003 was also a member of the Company's compensation committee, to engage, on a relatively contemporaneous basis with the effective date specified in the written consent, in individual telephonic discussions with each of the members of the applicable compensation committee, during which the committee member would indicate his approval of the option grants in question. In connection with significant acquisitions, the Company's historical practice was for its Board of Directors (including members of the applicable compensation committee) to consider during board meetings convened for the purpose of approving an acquisition the proposed stock option component that would be designated to an acquisition target's management team, with a unanimous written consent of the applicable compensation committee to follow at a later time with a specified effective date for the option grants in question.

Based on its option grant procedures, the Company has historically considered the effective date specified in the written consents by the applicable compensation committee as the accounting measurement date for determining stock based compensation expense under APB 25 and SFAS 123. However, the Company has determined, in consultation with its independent public accounting firm, that the proper accounting measurement date for stock option awards cannot precede the date on which the grants were approved through the execution of written consents or through a valid meeting of the applicable compensation committee. *Notwithstanding the Company's accounting determination noted above,* the Company believes that (i) its historical written consent effective date process is permitted under the Company's current and predecessor stock option plans and Delaware corporate law, (ii) the Company has consistently followed this process in prior accounting periods, and (iii) in many cases, the grants in question had been verbally discussed and approved by each of the members of the applicable compensation committee on a relatively contemporaneous basis with the specified effective date of those grants.

Accordingly, based on the preliminary results of its review of the Company's historical stock option practices, including its underlying option grant documentation and procedures, and the initial findings of its internal investigation (which is on-going and not complete as of the date of this filing), *the Company has preliminarily determined that it will record a cumulative prior period non-cash stock-based compensation expense charge in an amount that is not presently anticipated to exceed approximately $40 million. This charge relates to certain of the option grants covering approximately 24 million common shares (after giving effect to forfeitures of option grants covering approximately 7 million*

> *common shares) by the Company subsequent to its initial public offering*
> *in 1994 and through December 31, 2005.*

(Emphasis added).

72.     Then, on May 17, 2006, the Company received a grand jury document subpoena

issued by the U.S. District Court for the Southern District of New York requesting that the

Company produce documents relating to the granting of stock options from 1998 through the

present.

73.     On August 7, 2006, ACS *retracted* its May 10, 2006 statement, effectively

abandoning its claims that the stock options were not backdated, stating that "previously

disclosed preliminary findings regarding" suspected options malfeasance "can no longer be

relied upon" because the Company's prior statements would be "superseded by" ACS's

disclosure of the result of an internal investigation in September 2006.

74.     ACS then refused to discuss stock options backdating, the internal investigation or

any related topics on its August 9, 2006 quarterly conference call with shareholders and analysts.

75.     On September 14, 2006, ACS disclosed that ITS 2006 ANNAUL report on Form

10-K will be delayed due to the stock option investigation.  ACS also provided detail on the

purportedly "independent" investigation being conducted by the Company.  The release stated, in

pertinent part:

> As previously disclosed, beginning in March 2006 ACS' internal
> investigation was conducted, at the direction of the Board of Directors, by
> the Company's regular outside counsel, which had not been involved in
> the Company's historical stock option grant process. ACS' regular outside
> counsel also represented the Company in connection with the SEC
> informal inquiry which began in March 2006. In May 2006 the Company
> retained independent counsel, Bracewell & Giuliani LLP ("Investigation
> Counsel"), to jointly conduct the internal investigation with the
> Company's regular outside counsel and to represent the Company in
> connection with the investigations being conducted by the United States
> Attorney and the SEC.  Further, in July 2006 the ACS Board's Audit
> Committee, consisting of all four of the Company's independent directors,

retained its own independent counsel to assist the Audit Committee in monitoring the internal investigation.

In August 2006 the Company's Board of Directors voted to instruct Investigation Counsel to report the progress and findings of the internal investigation to the Board's independent directors and the Audit Committee and to change the role of its regular outside counsel to one of providing ongoing assistance to Investigation Counsel. In addition, the Company retained Skadden, Arps, Slate, Meagher & Flom LLP in August 2006 as its new regular outside corporate counsel. Subsequently, an Ad Hoc Committee of the Board of Directors, consisting of all the Company's independent directors, was formally established to monitor, oversee and direct the conduct of the internal investigation.

During the past week the Ad Hoc Committee received oral updates on the progress of the investigation from Investigation Counsel. The investigation into the Company's historic stock option grant practices is continuing and the investigation also includes a review of the preparation of the Company's Form 10-Q for the quarterly period ended March 31, 2006, as filed with the SEC on May 15, 2006. On August 7, 2006 the Company announced that previously disclosed preliminary findings of the investigation set forth in Note 3 to its consolidated financial statements included in its Form 10-Q should no longer be relied upon. The Ad Hoc Committee will make recommendations to the Board of Directors when it receives the final report of Investigation Counsel.

The Company's Audit Committee, which consists of the same individuals as the Ad Hoc Committee, has received periodic reports from Investigation Counsel. In addition, the Audit Committee does not expect the independent auditors to be in a position to complete the audit of the Company's financial statements until the internal investigation is complete and the independent auditors have had the opportunity to review the findings and any recommendations, including any actions recommended by the Ad Hoc Committee, Audit Committee and Board of Directors.

In view of the foregoing, the Company is not in a position to file its Annual Report on Form 10-K for its fiscal year ended June 30, 2006, as required to be filed by yesterday's close of business. While the Company is seeking to be in a position to file its Form 10-K by September 28, 2006, which is within the additional time period permitted under the SEC rules for an issuer to be deemed to have filed in a timely manner, there is no assurance that the Form 10-K will be filed by such date.

Absent a waiver, the Company may face covenant compliance issues under its March 2006 Credit Facility, including if it does not have audited financial statements within 90 days of the end of its fiscal year. The Company is in the process of seeking a waiver from the lenders under the

Credit Facility. Approximately $2.0 billion in borrowings are outstanding under the Credit Facility.

76.    On October 28, 2006, The Wall Street Journal reported, in substance, that the "internal probe" at ACS of the alleged backdating of executive stock options at the Company was being deemed insufficient by regulators. That article reported, among things:

> In at least one case, federal officials have stepped in when they felt an internal probe wasn't getting to the bottom of the matter, according to a person familiar with the circumstances. At Affiliated Computer Services Inc., a Dallas-based technology outsourcing company, executives benefited from a tremendously unlikely pattern of timing grants. A Wall Street Journal analysis last March put the odds at 300 billion to one that the dates on which grants purportedly had been awarded to the company's former CEO was chosen randomly. The company used its longtime outside counsel to conduct the probe.

> In May, the company announced a preliminary finding that there was no intentional backdating to enrich executives. Government officials prodded ACS to look harder, and the company hired a new team of lawyers with no connection to the firm. "From day one ACS has expected its legal counsel to leave no stone unturned and conduct a thorough, objective, and complete investigation of all the facts and that is exactly what is occurring," said spokesman Michael Buckley.

77.    Thereafter, on November 17, 2006, The Wall Street Journal reported, in substance, that the alleged backdating of executive stock options padded CEO pay by an average of 10% at the companies studied in the article (neither specifically including, nor specifically excluding, ACS). That article reported, among things:

> About 850 U. S. chief executives received backdated or otherwise manipulated their stock option grants that boosted their annual pay, on average, by at least 10%, according to a new study.

> The study, released yesterday by professors at Harvard and Cornell universities and the French business school Insead, bolsters the view of federal prosecutors who have viewed stock-option backdating as means to steal money from shareholders. Defendants of the companies who engaged in the practice have said that backdating often involved minor sums and was merely an alternative way of providing market based pay.

The study, a paper done for the Harvard Law School Program on Corporate Governance, didn't name executives or companies that may have backdated. It relied on broad statistical analyses that identified suspiciously "lucky" patterns of options granted at low prices.

The researchers also found that executives who repeated riches from backdating options started out with reported compensation that was richer than their peers at similar companies. On top of that above-average pay, executives received an average of an extra $1.3 million to $1.7 million through each manipulated grant, the academics found.

"It's not pocket change," said Lucian Bebchuk, a professor of law, economics and finance at Harvard and one of the study's authors.

78.    On November 27, 2006, ACS announced the completion of its internal investigation into its historical stock option practices. The Company stated that it was continuing to review and evaluate the results of the internal investigation and recent accounting guidelines established by the SEC to determine the accounting consequences of the use of incorrect measurement dates for certain stock option grants during the period from 1994 through 2005. The Company announced that it completed that review and evaluation and determined that the incremental cumulative non-cash compensation expense through June 30, 2006, related to incorrect accounting measurement dates is approximately $51 million and that *prior year financial statements will be restated*. Moreover, ACS is currently reviewing the tax impact, including related interest and penalties, associated with stock options and other matters. ACS senior executive King resigned from the Company effective on November 26, 2006.

79.    Unfortunately even the November 27, 2006 admissions by the Company of incorrect accounting measurement dates and the need to restate prior year financial statements was not nearly the end of the bad news for ACS. Since the announcement of November 27, 2006 additional substantial information has emerged demonstrating the seriousness of ACS's problems, the adverse effect these problems have had, and continue to have, on the value of ACS common stock and the fact that ACS's woes are still far from over.

52

80.    Thus, on November 28, 2006 <u>The Wall Street Journal</u> reported in relevant part:

[Yesterday] Affiliated Computer Services lost 49 cents, or 1%, to 50.25. The provider of information-technology solutions said its chief executive and chief financial officer resigned in the wake of an inquiry into stock-options accounting.

81.    On November 28, 2006 <u>The Dallas Morning News</u> reported in relevant part:

ACS revealed in March that the SEC was investigating its stock option grants.    The company's board launched an internal investigation to determine whether executives had retroactively timed stock option grants to dips in the company's stock price.    Such a practice would have allowed stock option recipients to buy shares at a very favorable discount, making them more profitable when sold.

The internal probe bound that Mr. King, Mr. Edwards and former CEO Jeffrey Rich "internationally misdated" documents related to stock option grants, ACS said Monday.    Attorneys for Mr. King and Mr. Edwards told several news outlets that their clients did not intentionally engage in misconduct.    An attorney for Mr. Rich did not return a phone message.

Mr. King and Mr. Edwards will remain ACS employees through June, and the company will increase the prices of their outstanding stock options to make up for the potential profits created with the improper grants.    The adjustments indicate that ACS believes the former executives could have cleared millions of dollars in profits - $4.5 million for Mr. and King and $1 million for Mr. Edwards – because of the way the grants were timed.

The company is considering whether to seek money from Mr. Rich, who left the company in 2005 and was rehired this year as a consultant.    The board's investigators did not have access to Mr. Rich as a witness, the company said.

The board's investigation did not find fault with Mr. Deason, the company's chairman and the head of the board's compensation committee from 1994 to mid-2003.    In the complex process the company described Monday, Mr. Deason gave top executives his broad authorization for stock option grants, and the executives filled in the details and did the paperwork, sometimes adjusting the dates of the grants to coincide with dips in the stock price.

*          *          *

Some investors have favorable view of ACS stock because they think the company, which came close to a buyout deal a year ago, could still be for sale, Adam Frisch, a UBS analyst, said in a research note.    He warned that

53

since the SEC has not completed its ACS investigation, other accounting-related issues could surface.

"We remain cautious on shares until we get those issues cleared up," he said.

82.    On November 28, 2006 The New York Times reported in relevant part:

Affiliated Computer Services said yesterday that its chief executive and chief financial officer had resigned because of their roles in improper stock option grant practices.

It also said it planned to take about $51 million in charges related to problems with previous stock options grants.

Analysts described the move as positive. "They clearly today sent a signal that they are taking this very seriously," said Joseph A. Vafi, an analyst for Jefferies & Company.

*        *        *

The company's shares fell 49 cents yesterday, to $50.25, on the New York Stock Exchange,

A.C.S. said it had not yet determined the impact of the accounting adjustments on its financial statements "nor whether it will be required to restate its consolidated financial statements as a result of these adjustments."

83.    On December 1, 2006 The Dallas Morning News reported in relevant part:

Affiliated Computer Services Inc. has a host of legal and financial issues to resolve – from stock options lawsuits to disputes over bond repayments to grand jury subpoenas and more.

*        *        *

Debt repayments – When ACS launched its internal investigation into the stock option backdating this year, the company was unable to file some of its financial reports on time.

Whitebox Advisors LLC, a hedge fund based in Minneapolis that owns some ACS bonds, said the delayed filing put ACS in technical default on those bonds. As a result, Whitebox argued, ACS has to repay hundreds of millions of dollars in bonds immediately rather than over several years.

ACS does not believe that the delay triggered a default on the bonds and has filed a lawsuit to get the matter settled in court.

"We firmly believe that their assertion is incorrect," Mr. Lightfoot said.

Grand jury subpoena – Although ACS has completed its investigation into the stock options backdating, government officials have not.

The Securities and Exchange Commission is still investigating the options practices at ACS, and the U.S. Attorney for the Southern District of New York has issued a grand jury subpoena.

Mr. Lightfoot said he couldn't comment on how those investigations are proceeding, but he said his company has been diligent about providing the SEC with all the information it can.

84.     On December 7, 2006, ACS's senior management made a presentation to the Audit Committee of the Company's Board of Directors of its determination to restate financial statements.    The Audit Committee concurred with and approved senior management's determination.  The Company then reported in relevant part:

> Accordingly, the Company's financial statements for the years ended June 30, 1995 thru June 30, 2005 and for the nine month period ended March 31, 2006, the interim periods contained therein, and *the related financial information contained in all earnings and press releases (including for the quarter ended September 30, 2006) and similar communications issued by the Company for such periods should no longer be relied upon*.  The increase (in millions) in non-cash compensation expense from that previously reported for each of the most recent five fiscal years is approximately as follows: June 30, 2002 - $8; June 30, 2003 - $9; June 30, 2004 – $8; June 30, 2005 - $6; and June 30, 2006 – $2.

(Emphasis added).

85.     On January 6, 2007 The Wall Street Journal reported in relevant part:

> Affiliated Computer Services Inc. for the first time said its chairman, Darwin Deason, benefited from a wrongly dated stock option, adding that a portion of the 2002 award would be repriced to cut its potential value by $655,000.

> But the company said the repricing is being done for tax reasons, and repeated its earlier insistence that an internal probe didn't find evidence that Mr. Deason's 2002 option grant had been improperly backdated.

86.     On January 23, 2007 ACS belatedly filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 20, 2006.  Under the heading "Review of Stock

Option Grant Practices" the Company reiterated certain prior announcements concerning its

internal investigation of executive stock option grant practices. The January 23, 2007 Form 10-

Q admitted that the Company's may 2006 Form 10-Q "was inaccurate", that former CEO King

had "violated our Code of Ethics for Senior Financial Officers" and that the Company could not

predict what tax underpayment deficiencies, interest and penalties would have to be paid in the

future as a result of the facts determined by the internal investigation. The January 23, 2007

Form 10-Q stated in relevant part:

> During the course of the investigation, more than 2 million pages of electronic and hardcopy documents and emails were reviewed. In addition, approximately 40 interviews of current and former officers, directors, employees and other individuals were conducted. The independent directors, in their role as special committee members and as independent directors prior to formation of the committee, met extensively since the SEC informal investigation commenced to consider the matters related to the stock option grant practices. The investigation was necessarily limited in that the investigation team did not have access to certain witnesses with relevant information.

> *       *       *

> The investigation concluded that in a significant number of cases Mr. Rich, Mr. King and/or Mr. Edwards used hindsight to select favorable grant dates during the limited time periods after Mr. Deason had given the officers his authorization to proceed to prepare the paperwork for the option grants and before formal grant documentation was submitted to the applicable compensation committee. No evidence was found to suggest that grant dates which preceded Mr. Deason's broad authorization were ever selected. In a number of instances, our stock price was trending downward at the time Mr. Deason's authorization was given, but started to rise as the grant recommendation memoranda were being finalized. The investigation found that in those instances Mr. Rich, Mr. King and/or Mr. Edwards often looked back in time and selected as the "grant date" a date on which the price was at a low, notwithstanding that the date had already passed and the stock price on the date of the actual selection was higher. Recommendation memoranda attendant to these grants were intentionally misdated at the direction of Mr. Rich, Mr. King and/or Mr. Edwards to make it appear as if the memoranda had been created at or about the time of the chosen grant date, when in fact, they had been created afterwards. As a result, stock options were awarded at pries that were at, or near, the

quarterly low and we effectively granted "in the money" options without recording the appropriate compensation expense.

*        *        *

The evidence gathered in the investigation disclosed that aside from Mr. Rich, Mr. King and Mr. Edwards, one other of our current management employees, who is not an executive officer or director, was aware of the intentional misdating of documents. Based on the evidence reviewed, no other current executives, directors or management employees were aware of either the improper use of hindsight in selecting grant dates or the intentional misdating of documents. It was also determined that these improper practices were generally followed with respect to option grants made to both senior executives and other employees. No evidence was found to suggest that the practices were selectively employed to favor executive officers over other employees.

*        *        *

Further, with respect to our May 2006 Form 10-Q, the investigation concluded that Note 3 to the Consolidated Financial Statements which stated, in part, that we did "not believe that any director or officer of the Company has engaged in the intentional backdating of stock option grants in order to achieve a more advantageous exercise price," *was inaccurate because, at the time the May 2006 Form 10-Q was filed, Mr. King and Mr. Edwards either knew or should have known* that we awarded options through a process in which favorable grant dates were selected with the benefit of hindsight in order to achieve a more advantageous exercise price and that the term "backdating" was readily applicable to our option grant process. Neither Mr. King nor Mr. Edwards told our directors, outside counsel or independent accountants that our stock options were often granted by looking back and taking advantage of past low prices. Instead, both Mr. King and Mr. Edwards attributed the disparity between recorded grant dates and the creation dates of the paperwork attendant to the stock option grants to other factors that did not involve the use of hindsight.

The investigation concluded that the conduct of Mr. King and Mr. Edwards with regard to the misdating of recommendation memoranda as well as their conduct with regard to the May 2006 Form 10-Q *violated our Code of Ethics for Senior Financial Officers*.

*        *        *

At September 30, 2006, we have recorded approximately $38.5 million of additional income taxes payable, including estimated interest and penalties related to disallowed Section 162(m) executive compensation deductions either resulting from revised measurement dates or due to factors unrelated

to revised measurement dates, but which were previously believed to qualify for Section 162(m) deductions. At this time, we cannot predict when the Section 162(m) underpayment deficiencies, together with interest and penalties, if any, will be paid. We expect to fund any such payment from cash flows from operating activities.

(Emphasis added).

87.   On January 22, 2007 <u>The Dallas Business Journal</u> reported in relevant part:

Affiliated Computer Services Inc., which has been the center of federal and Securities and Exchange Commission investigations, has hired a chief ethics officer.

The Dallas-based information technology firm said Monday that Daisy Fernandez Seebach will join the company on Jan. 23 in the newly created position.

Seebach will implement and monitor programs that detect and prevent unethical or illegal conduct and provide strategic focus on the company's ethics and values.

88.   On January 24, 2007 <u>The Dallas Morning News</u> reported in relevant part:

Affiliated Computer Services Inc. filed its 2006 annual report and 2007 first-quarter report late Tuesday, restating some of its financial reports due to stock options backdating by some of its former executives.

ACS had previously said that it expected the additional compensation costs to total about $51 million, but it laid out in more detail Tuesday exactly what the costs should have been each year since 1995.

The 2006 annual report had been delayed until the stock option investigation could be completed.

According to the report filed with the Securities and Exchange Commission, for the fiscal year ended June 30, 2006, ACS had revenue of $5.4 billion, compared with $4.4 billion in 2005.

Revenue numbers were not affected by the stock option compensation costs.

Net income, however, did change.

For 2006, ACS reported a profit of $358.8 million, down from $409.6 million in 2005.

ACS had originally said 2005 profit was $415.9 million.

Net income for 2004 was also revised downward to $521.7 million from $529.8 million.

For the first quarter of fiscal 2007, which ended Sept. 30, revenue was $1.39 billion, up from $1.31 billion a year ago.

Net income, though, was $61.4 million, or 59 cents per share, down from a revised $93.4 million, or 73 cents per share, a year ago.

89.     On January 26, 2007, the Company filed another Form 8-K with the SEC. Previously, on or about September 28, 2006, ACS had imposed a temporary suspension of future purchases of its common stock pursuant to the Plan, due to lateness in filing the Annual Report on Form 10-K for the fiscal year ended June 30, 2006. The September 28, 2006 suspension did not cause the sale of any employer stock in the individual accounts under the Plan, but only temporarily suspended future purchases of additional shares of employer common stock. However, even this temporary suspension of future purchases of employer stock was lifted, effective January 24, 2007, as reported in the January 26, 2007 Form 8-K.

90.     On February 1, 2007, the Company filed with the SEC an amended annual report on Form 10-K/A (Amendment No. 1). The amended annual report specifically acknowledges as a "Risk Factor" the ongoing SEC and Department of Justice investigations into the Company's executive stock option practices. The February 1, 2007 Form 10-K/A acknowledged:

> We cannot assure that the SEC and/or DOJ will not seek to impose fines or take other actions against us *that could have a significant negative impact on our financial condition.* In addition, publicity surrounding the SEC's and DOJ's investigations, the derivative causes of actions, or any enforcement action, ***even if ultimately resolved favorably for us, could have a material adverse impact on our cash flows, financial condition, results of operations or business.***

(Emphasis added).

91.     On February 13, 2007, <u>The Dallas Business Journal</u> reported in relevant part:

Affiliated Computer Services Inc. fiscal second-quarter 2007 profit dropped 30 percent, hurt by legal expenses related to stock option investigations and shareholders lawsuits.

The Dallas-based information technology company reported net income of $72.1 million, or 72 cents a share, down from $102.4 million, or 81 cents a share, in the previous year's second quarter.

Revenue rose 6 percent to $1.4 billion from $1.3 billion a year ago.

Analysts surveyed by Thomson First Call were looking for earnings of 78 cents a share, on revenue of $1.44 billion.

ACS (NYSE:ACS) said the second-quarter 2007 results included expenses of 9 cents per share related to legal and other expenses related to ongoing stock option investigations and shareholder derivative lawsuits related to the company's stock option granting practices.

92.    On February 14, 2007, The Dallas Morning News reported in relevant part:

Dallas-based Affiliated Computer Services Inc. said Tuesday that its revenue rose in the second quarter but profit fell, continuing a recent trend.

\*        \*        \*

After the data were released, Ann Vezina, chief operating officer of the commercial business segment at ACS, acknowledged on a conference call that **the *publicity from the options investigations and delayed filings has probably driven away some potential customers*.**

(Emphasis added).

93.    On February 19, 2007, The Dallas Morning News reported in relevant part:

Affiliated Computer Services Inc.'s profits have been shrinking and its debt has been climbing for the past two years.

Last week, the company's second-quarter financial report showed more of the same, adding to a long list of recent woes at the Dallas-based firm.

But even as straws seem to pile up on the camel's back, company officials and analysts who track the firm say ACS may actually be on the verge of a comeback.

"We really do believe that the distractions that we've been dealing with are behind us," said Lesley Pool, senior vice president and chief marketing officer at ACS.

ACS has been mired in a series of troubles over the last few years, including investigations into improper stock options grants, delayed regulatory filings, shareholder lawsuits, shrinking profits and executive shake-ups.

It also remains a perennial target for buyout rumors.

\*      \*      \*

ACS executives acknowledged during a conference call last week that the bad publicity surrounding the investigations and lawsuits probably has spooked some potential clients. But Ms. Pool said that current customers are overwhelmingly loyal to ACS and that new contracts are being signed.

She also noted that many other Fortune 500 companies are going through stock options investigations right now, and that it's become clear that such an investigation doesn't necessarily hamper a company's day-to-day operations.

"Most of major corporate America today is dealing with this issue," she said.

94.     In March 2007, a private equity firm (Cerberus Capital Management) and ACA founder Darwin Deason proposed a takeover offer for the Company.  This takeover offer supported the market price for ACS common stock for months.  For example, on March 20, 2007, the Associated Press reported that the takeover offer "lifted ["ACS"] stock and the S&P 500" and that, indeed, ACS was the S&P 500's biggest gainer on the day of the buyout announcement.

95.     However, the buyout offer, while it did serve to prevent further erosion in the market price of ACS stock resulting from the executive options scandal, did not make the options scandal go away.  Indeed, and to the contrary, management tensions resulting from the options scandal interfered with the success of the buyout proposal.  For example, shortly after the buyout offer was announced, the Associated Press reported (on March 22, 2007):

A handwritten note in which the chairman of Affiliated Computer Services said the company "always" picks the "lowest" prices in the quarter to

61

award stock options has surfaced as part of an investigation into options backdating at the company, the Wall Street Journal reported Thursday.

The note calls into questions claims the company made that Chairman Darwin Deason did not know about options backdating at the company.

96.     Then, when the buyout proposal was withdrawn, on November 1, 2007, it was publicly reported that tensions among the Company's board members and executives contributed to the withdrawal.   On November 2, 2007, *The Wall Street Journal On Line* reported that relations between ACS' Directors and Deason

Frayed last year amid federal investigations into alleged manipulations of the company's stock options.   An internal board investigation concluded two senior executives as well as a third executive who had left ACS for unrelated reasons were closely involved in stock-options manipulation at the company.  Federal investigations are continuing.

After the independent directors learned that senior management hadn't been candid with investors about the gravity of the options problems, they demanded that the chief executive and chief financial officer leave their posts, according to a person close to the independent directors.   Mr. Deason initially balked at such a move, this person says, but relented, and the two officers resigned.

Relations between Mr. Deason and the board were never the same, the person says.

A person close to Mr. Deason agreed that relations had chilled since the options investigations. . . .

97.     The executive stock option scandal at ACS has thus been material to the Company and the value of its common stock, including the common stock held by the Participants in their plan accounts, by any reasonable measure, throughout the Class Period.

98.     ACS misrepresented in public SEC filings that the stock options were priced at not less than the fair market value of the stock on the date of grant, thereby affirmatively concealing the claims set forth herein.   The shareholder-approved stock option plans were exhibits that were incorporated by reference each year in ACS's SEC annual reports and

summary plan descriptions.  ACS' misrepresentations about its stock option pricing practices were known to be false and were made in reckless disregard of their truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder.

## THE COMPANY'S FALSE AND MISLEADING SEC FILINGS

**ACS's False and Misleading
Registration Statement and Prospectus**

99.    In connection with ACS's initial public offering of stock, ACS filed a Form S-1 Registration Statement with the SEC on September 26, 1994.   ACS's Prospectus was incorporated in the Registration Statement.

100.    The Form S-1 Registration Statement and Prospectus were materially false and misleading due to misrepresentations made by ACS regarding ACS's stock options practices.  In particular, ACS stated:

> The exercise price of an Incentive Stock Option shall be no less than 100% of the fair market value of the Company's Class A Common Stock at the time of the grant . . . .  Fair market value is determined by the Compensation Committee in accordance with the terms of the Stock Option Plan. After registration of the Company's Class A Common Stock pursuant to the Registration Statement of which this Prospectus is a part, fair market value will be determined by reference to the stock's closing price on the date of the grant.

101.    ACS's financial results for the fiscal fourth quarter and years ended 1996-2005, including the periods ending June 30, 1996-2005, were reported in the Company's Reports on Form 10-K405 and 10-K filed with the SEC.  Each Form 10-K 405 and 10-K was simultaneously distributed to shareholders (including, Plaintiffs and Plan Participants).

102.    The 1996-2005 Forms 10-K405 and 10-K included ACS's 1996-2005 financial statements and notes thereto, which were materially false and misleading and presented in violation of Generally Accepted Accounting Principles ("GAAP"), due to improper accounting

for the backdated stock options. At all relevant times, ACS represented that it accounted for stock options using the intrinsic method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). See, e.g., 1999 Form 10-K, Ex. 13.1 at 20 ("[T]he company has elected to adopt the disclosure-only provisions of SFAS 123 and will continue to account for stock-based employee compensation plans in accordance with APB 25."); 2002 Form 10-K at 44 ("[W]e have elected to adopt the disclosure-only provisions of SFAS 123 and will continue to account for stock-based employee compensation plans in accordance with APB 25.").

103.    Under APB 25, ACS was required to record as an expense on its financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is "in-the-money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or underwater on the measurement date need not be expensed.

**ACS's False and Misleading Proxy Statements**

104.    ACS transmitted to its shareholders (including Plaintiffs and Plan Participants) a proxy statement in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the period 1995 through 2006. The ACS proxy statements that were sent to shareholders (including Plaintiffs and Plan Participants) annually in connection with annual shareholders' meeting typically concerned the election of directors, the approval and adoption of ACS's stock option plan and authorization to reserve shares for future issuance under the stock option plans, approval of the ACS Performance-Based Incentive Compensation program for executive officers, and ratification of the selection of ACS's auditor.

Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about ACS's stock option practices and violations of the terms of the 1988 and 1997 Stock Option Plans, including, among other things, that (i) stock options were priced at fair market value on the date of the grant; and (ii) ACS followed and adhered to APB 25.

      105.    The proxy statements at issue are the following:

| Date of Letter to Shareholders | Shareholder Meeting Date |
|---|---|
| 10/16/95 | 11/7/95 |
| 9/30/96 | 10/28/96 |
| 11/14/97 | 12/16/97 |
| 10/28/98 | 11/27/98 |
| 9/28/99 | 10/26/99 |
| 9/28/00 | 10/26/00 |
| 9/28/01 | 10/25/01 |
| 9/24/02 | 10/24/02 |
| 9/29/03 | 10/30/03 |
| 9/27/04 | 10/28/04 |
| 9/30/05 | 10/27/05 |

## DAMAGES TO THE PLAN AND ITS PARTICIPANTS

      106.    As a result of the foregoing, the Plan has suffered substantial losses and the retirement savings of the Participants have been greatly diminished. That the market price of ACS common stock dropped by about $5 per share, or about 10%, when The Wall Street Journal published its article about the backdating of executive stock options at ACS in April 2006. This is no coincidence but, rather, demonstrates that the unlawful activities alleged herein (and summarized by The Wall Street Journal), have resulted in a substantial diminution in the value of ACS common stock and in the value of the ACS Stock Fund held in the Plan accounts of Participants. Had Defendants not engaged in the breaches of fiduciary duty alleged herein, Participants' accounts would not have suffered loss from the diminution in value of ACS common stock, and Participants would have substantially increased their retirement savings by

investing in other, better performing investment alternatives. In addition, as alleged above, the executive stock options scandal at ACS has been material to the Company and the value of ACS common stock, including the ACS common stock held by the Participants in their Plan accounts, throughout the Class Period.

### ACS REGULARLY COMMUNICATED WITH PARTICIPANTS IN THE PLAN CONCERNING ACS STOCK OFFERED BY THE PLAN, YET FAILED TO DISCLOSE THE IMPRUDENCE OF INVESTMENT IN COMPANY STOCK

107.    The Company regularly communicated with employees, including Participants in the Plan, about the performance, future financial and business prospects of the Company's common stock. During the Class Period, the Company fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock and units. As such, Participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and units and therefore could not make informed decisions regarding their investments in the Plan.

108.    As noted above, these SEC filings and related Company statements and releases were inaccurate, incomplete and materially misleading, causing the Plan and its Participants to purchase and to hold and maintain, Plan investments in ACS stock and units.

109.    ACS failed to provide Plan Participants with complete and accurate information regarding ACS stock, such that the Participants could appreciate the true risks presented by investments in ACS stock and units and could make informed decisions regarding investments in the Plan.

## CLAIMS FOR RELIEF UNDER ERISA

110.    At all relevant times, Defendants ACS and the Committee were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

111.    ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

112.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any diminution of vested benefits to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

113.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, aid with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

114.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things,

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance company stock, to ensure that each investment is a suitable option for the plan; and

(b)    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

115.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that: ". . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(8), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless be makes reasonable efforts under the circumstances to remedy the breach."

116.    Plaintiffs therefore bring this action under the authority of ERISA § 502 for Plan wide relief pursuant to ERISA § 409(a) to recover the diminution of vested benefits sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants.

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE PLAN ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404)

117.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

118.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

119.    As alleged above, Defendants were responsible for the selection, maintenance and monitoring of the Plan's investment options, including the option of Company stock and units.

120.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in the ACS stock and units fund in the Plan were prudent and are liable for the diminution of vested benefits incurred as a result of such investments being imprudent.

121.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

122.    The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that ACS stock was not

a suitable and appropriate investment for the Plan as described herein for either (i) ACS stock purchased through participant contributions to the Plan or (ii) ACS stock and units accumulated by the Plan through Company matching contributions. Nonetheless, during the Class Period, these fiduciaries continued to offer the ACS stock as an investment option for the Plan and to direct and approve Plan investment in ACS stock and units, instead of in cash or other investments. Moreover, during the Class Period, Defendant failed to take adequate steps to prevent the Plan, and indirectly the Plan Participants and beneficiaries, from suffering a diminution of vested benefits as a result of the Plan's investment in ACS stock.

123.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

124.    The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow Defendants' failure to prudently and loyally manage Plan assets in the exercise of their discretion with respect to the offering Company stock and units as an investment option in the Plan despite knowing that such failures were breaches of their ERISA mandated fiduciary duties.

125.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

126.    Pursuant to ERISA § 502(a), 29U S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the loss benefits to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### FAILURE TO PROVIDE COMPLETE AND ACCURATE INFORMATION TO PLAN PARTICIPANTS AND BENEFICIARIES (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND 405 OF ERISA)

127.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

128.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

129.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

130.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan.  This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, such that Participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.  This duty applies to all Plan investment options, including investment in ACS stock.

131.    Because investment in the Plan was not diversified (*i.e.*, the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in ACS stock and

units), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to ACS stock and units.

132.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding ACS and its stock. ACS's business improprieties, public misrepresentations and inflated earnings, and the consequent artificial inflation of the value of ACS stock and, generally, by conveying inaccurate information regarding the soundness of ACS stock and the prudence of investing retirement contributions in ACS equity. These failures were particularly devastating to the Plan and the Participants and had an enormous impact on the value of Participants' retirement assets.

133.    Defendants are also liable as co-fiduciaries because (a) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding ACS stock, despite knowing of their breaches; (b) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (c) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Participants, yet did not make any effort to remedy the breaches.

134.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan Participant that results in harm to the Participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above described statements, acts and omissions of the Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in ACS stock and were

material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in ACS stock during the Class Period. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

135.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

136.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

137.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the diminution of vested benefits to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT III**

**FAILURE TO ACT EXCLUSIVELY IN THE INTERESTS OF
PARTICIPANTS IN THE PLAN -- BREACHES OF
FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405**

138.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

139.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

140.    Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge their responsibilities solely in the interest of Plaintiffs and the members of the Class and for the exclusive purpose of providing benefits to the Plan, Plaintiffs and the Class.

141.    Defendants breached their duty of loyalty by:

(a)     Failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investments in ACS securities;

(b)     Failing to notify appropriate federal agencies of the facts and transactions which made ACS securities an unsuitable investment for the Plan;

(c)     Failing to take such other steps as were necessary to ensure that the interests of Plaintiffs and members of the Class were loyally and prudently served;

(d)     By otherwise placing the interests of ACS and themselves above the interests of the Participants with respect to the investments of the Plan in the ACS securities; and

(e)     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the members of the Class, suffered losses for which Defendants are liable.

**COUNT IV**

**PROHIBITED TRANSACTIONS
IN VIOLATION OF ERISA § 406**

142.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

143.    In connection with their actions and omissions in authorizing and causing the Plan to continue to offer and require ACS securities as an investment during the Class Period and permitting and requiring Plaintiffs and members of the Class to invest in ACS securities at a time when Defendants knew or reasonably should have known about the significant risks to ACS – from the executive option scandal at the Company material risks that were undisclosed or misrepresented to Plaintiffs and the Class – and that as a result, the prices per share at which the Plan was acquiring ACS securities grossly exceeded fair market value, Defendants caused the

Plan to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plan and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

144.    Because the price Defendants caused the Plan to pay for such securities was materially, artificially inflated, exceeding fair market value, the prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).

145.    ACS is liable for this violation as a "party in interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

146.    During the Class Period, ACS securities were artificially inflated in value such that Defendants continued to engage in prohibited transactions by causing the Plan to pay an artificially inflated price for ACS securities.

147.    During the Class Period, the Plan invested, upon information and belief, millions of dollars in both participant and company-matching contributions in ACS securities, at artificially inflated prices. The Plan and its Participants thus over-paid for their "participation interests" in the Plan.

148.    Because the Plan's acquisition of ACS securities at artificially inflated prices were prohibited transactions, a per se violation of ERISA § 406(a), 29 U.S.C. § 1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiffs seek on behalf of herself and the members of the Class to rescind all transactions purchasing or acquiring ACS securities.

149.    Further, to restore the Plan and its Participants and beneficiaries to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plan is entitled to recover the amount that the contributions used to purchase ACS securities for the Plan would have earned had such amounts been invested in suitable investment options.

75

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

150.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock and units.

151.    As a consequence of Defendants' breaches, the Plan suffered a significant diminution in vested benefits.

152.    Each Defendant is jointly liable for the acts of the other Defendant as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    An Order compelling Defendants to make good to the Plan all loss of vested benefits to the Plan resulting from Defendants' breaches of their fiduciary duties, including a loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Company stock and units maintained by the Plan in proportion to the accounts' diminution of vested benefits attributable to the decline in the price/value of Company stock and units;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.    An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated:  December 3, 2007.

Respectfully submitted,

_____
Thomas E. Bilek
State Bar No. 02313525
**THE BILEK LAW FIRM, L.L.P.**
1000 Louisiana, Suite 1302
Houston, Texas  77002
(713) 227-7720
FAX (713) 227-9404

Thomas J. McKenna
**GAINEY & McKENNA**
295 Madison Avenue, 4th Floor
New York, New York  10017
(212) 983-1300
Fax: (212) 983-0383